FILED

JUN 23 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INFORMATION |
| ) | |
| Plaintiff, ) | **1:23 CR 00327** |
| ) | |
| v. ) | CASE NO._____ |
| ) | Title 18, United States Code, |
| RAO GARUDA, ) | Section 371; Title 26, United |
| ) | States Code, Section 7206(2) |
| Defendant. ) | **JUDGE FLEMING** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

The Defendant and Related Entities and Individuals

1.  Defendant RAO GARUDA was a resident of Cuyahoga County, Ohio. Defendant was the President and Chief Executive Officer of Associated Concepts Agency, Inc. ("ACA"). Defendant had more than thirty-five years of experience in the financial services industry and has written several books on financial and tax topics.

2.  ACA was a financial planning firm located in Cuyahoga County, Ohio. Defendant established ACA in 1977. ACA provided financial services to its clients, including selling life insurance products. Beginning in or around January 2013, Defendant and ACA assisted Individual A in marketing a tax plan to clients that had been created by Individual A, called the Advanced Legacy Plan or Ultimate Tax Plan. This plan was designed to enable high-income individuals to reduce their taxes. The selling and implementation of this plan was not ACA's primary business.

3.  Individual A was an attorney who resided in Florida. Individual A represented to Defendant that Individual A was an attorney and had the following licenses and accreditations,

among others: Certified Public Accountant, Master of Business Administration, and certified valuation appraiser.

4. Cullen Fischel (charged separately) was an employee of ACA from May 2015 through December 2019 and held various titles, including Marketing Manager (May 2015 through May 2016), Director of Business Development (May 2016 through June 2018), Wealth Management Advisor (June 2018 through December 2019), and Chief Operating Officer (January 2019 through December 2019). Fischel provided services to ACA as an independent consultant from January 2020 through August 2020.

5. Compassion Beyond Borders, Inc. ("CBB") was a non-profit entity established by Defendant in 2016. Defendant and Fischel served as the President and Vice President, respectively. Defendant established CBB at the direction of Individual A.

6. Charity 1 was a non-profit entity controlled by Individual A.

7. On or about April 3, 2018, the United States filed a Complaint for Permanent Injunction and Other Relief against Individual A in the United States District Court for the Southern District of Florida (the "Injunction Suit") seeking to enjoin Individual A from, among other things, promoting and organizing an illegal charitable contribution scheme that claimed clients could obtain charitable contribution deductions on their tax returns but retain control and use over the assets donated. On or about April 26, 2019, the District Court entered a permanent injunction against Individual A that, among other things, enjoined Individual A from promoting and organizing the charitable contribution scheme.

COUNT 1
(Conspiracy to Defraud the United States, 18 U.S.C. § 371)

The United States Attorney charges:

8. The allegations contained in paragraphs 1 through 7 of this Information are incorporated by reference as if stated fully herein.

The Conspiracy and Scheme to Defraud

9. From in or around January 2013, and continuing through in or around August 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant RAO GARUDA, Cullen Fischel, and Individual A did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individuals known and unknown to the United States Attorney, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely, income taxes.

Manner and Means of the Scheme

10. The manner and means by which Defendant and his co-conspirators carried out the scheme included, but were not limited to, the following:

*The Transaction*

11. Individual A organized, marketed, promoted, and sold an illegal charitable contribution transaction ("Transaction") as a way for high-income clients to obtain a charitable contribution deduction on their tax returns but retain control and use over the assets donated.

12. Each Transaction involved the following steps:

   a. A limited liability company (an "Entity") was formed;

  b. A client transferred property, such as cash, securities, promissory notes, real estate, or other business interests, to the Entity in exchange for 100% ownership interest in the Entity;

  c. The client assigned 100% ownership interest in the Entity to a charity controlled by the co-conspirators (a "Charity"), such as Charity 1 and CBB;

  d. The client was required to execute and sign an LLC agreement, a document issuing LLC units from the Entity to the client (an "issuance document"), and an assignment document assigning the LLC units to a charity (an "assignment document");

  e. In exchange for the assignment to the Charity, the client received an Internal Revenue Service ("IRS") Form 8283 ("Noncash Charitable Contributions"), signed by Individual A as an appraiser and signed by a representative of the Charity; and

  f. Based on the Form 8283, the client claimed a charitable contribution deduction on their federal tax return in the amount of the value of the Entity interest purportedly transferred, gifted, or donated to the Charity.

13. Defendant, Individual A, and Fischel marketed the Transaction as allowing the clients, as managers of the Entities, to retain complete dominion and control over their Entities and their Entities' assets. Clients had unfettered access to their assets inside the Entities through tax-free loans that were payable only upon the death of a client. The Charities had no control on how the clients managed the Entities. In practice, some Entities paid a small fraction of the funds sent through the Transaction to other charities for actual charitable purposes.

14. Defendant, Individual A, and Fischel marketed the Transaction as not only permitting a charitable contribution deduction, but also allowing a client to grow assets tax-free within the client's Entity.

15. Individual A trained Defendant on how to market, promote, and implement the Transaction and assisted Defendant in designing promotional material, including PowerPoint presentations and feasibility studies.

*Illegal Backdating*

16. For some clients, Defendant, Individual A, Fischel, and other co-conspirators illegally backdated documents to assist clients in claiming deductions after the close of a tax year, avoiding the rule that a taxpayer may not claim a charitable-contribution tax deduction unless he or she made the charitable contribution in the taxable year.

17. To backdate purported charitable contributions, Defendant, Individual A, Fischel, and other co-conspirators directed clients to use preexisting Entities (sometimes referred to as "Shelf LLCs") that Individual A had created and formed at the end of the prior year.

18. Defendant, Individual A, and Fischel prepared documents related to the Transaction to give the appearance that the charitable contributions occurred within the taxable year, when the contributions actually occurred in the subsequent year.

19. In an effort to substantiate the Transactions entered into by their clients, Defendant, Individual A, Fischel, and others assisted clients in submitting backdated documents—including issuance documents, assignment documents, and promissory notes—in response to civil subpoenas that the United States issued in the Injunction Suit.

Overt Acts

20. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Ohio, and elsewhere, at least one of the following overt acts, among others:

*Warnings About the Transaction*

21. Defendant received and provided to Individual A warnings about the legitimacy of the Transaction, including the following warnings:

   a. On or about June 10, 2013, Client 7 sent an email to Defendant, forwarding an email from Attorney 1 who advised that "Basically, I'm not comfortable with the proposal because there is too much inside influence. Tell the promoter that he may not be in charge, and that loans would be an excess benefit resulting in excise taxes." Defendant forwarded the email to Individual A.

   b. On or about September 30, 2013, a client sent an email to Defendant and Individual A, attaching a letter sent from Attorney 2 who advised that "there are significant risks involved, including but not limited to disallowance of the charitable deductions, potential application of the economic substance doctrine, potential fiduciary duty issues and potential interest and penalties."

   c. On or about April 8, 2014, a prospective client sent an email to Defendant and Individual A, stating that: "The deal-killer is what [Individual A] explained as the promissory note that would be dated some day prior to the end of 2013, and to be so signed by us. While [Individual A] reassured us that nobody who's been audited has been challenged on when they signed the note, I would not want to be the first to face that question. We do not want to be a party to such a play with the truth, even if we can survive an audit. . . . I cannot in good conscience sign myself or my wife to any such backdating."

   d. On or about May 25, 2015, Defendant received a recommendation from a friend warning that the Transaction may violate the automatic benefit transaction rules and recommended that Defendant contact his own legal advisors.

6

  e. On or about February 16, 2016, Defendant forwarded to Individual A and others a link for a Forbes article entitled "Identical Twins: The LLC-2 Tax Shelter Takes Over Where the SC-2 Tax Shelter Left Off," which described the author as "one of the foremost tax attorneys in the country."

  f. On or about January 27, 2017, Defendant received an email that forwarded an opinion of the Transaction from Attorney 3 who stated that "the transaction is clearly fraudulent and will not withstand scrutiny from the IRS for a whole host of reasons," discussed those reasons, and attached a bankruptcy petition which referred to a fraud lawsuit against Individual A for a charitable planning technique.

 22. Individual A responded to the warnings described in the previous paragraph by representing in each instance that the plan for the Transaction was legal.

*Client 1*

 23. On or about April 14, 2017, Defendant received an email stating that Client 1 owed $260,000 in taxes for 2016 and was interested in the Transaction.

 24. On or about April 15, 2017, Defendant emailed Client 1's financial planner to schedule a call and "to follow up if the client wants a 2016 deduction."

 25. On or about July 27, 2017, Defendant held a conference call with Client 1 and Client 1's financial planner and explained, among other things, how the Transaction worked, the benefits of using the Transaction, and how the Transaction differed from other common charitable giving structures, including a Donor Advised Fund and Family Foundation. Defendant explained the following:

> So a Limited Liability Company has what is known as a managing member. A managing member is the only one that can manage this money. There is nobody else that can touch this money. Nobody . . . can do anything with this. You know, [your financial planner]

7

> cannot do anything with this. I cannot do anything with this. You are the only one that can do anything with this money
>
> ...
>
> [Y]ou own this bank. You're the managing member. You control this bank. You don't own it. You manage it. . . . So you can give yourself a loan of $350,000 . . . at age 65. . . . So if you did that from 65 to 95, that's $350,000 a year for 25 years [sic]. So you have yourself almost a little more than $9 million, right? . . . You are borrowing money from your own LLC. When you borrow money, there is no tax. . . . So when you put money in, you get a deduction, when the money grows, there's no tax and then when you borrow money, there is no tax.

26. During the July 27, 2017 call, Defendant further stated that Client 1 could begin taking loans from the LLC after three years once the IRS audit period expired on the deduction: "The reason for that is usually IRS statute of limitation is three years for audits. . . . So for the first three years, we don't want you to borrow any money."

27. On or about August 9, 2017, Defendant held a conference call with an ACA employee, Client 1, Client 1's financial planner, and Individual A to discuss the Transaction. Defendant and Individual A explained, among other things, how they would backdate Transaction documents to assist Client 1 in claiming a charitable contribution deduction for the prior year, 2016:

> **Defendant:** [Client 1] needs the deduction for 2016. So, you know, he – you have to explain to him how you get that?
>
> **Individual A:** Yeah. So we already have an LLC set up, 2016 LLC. You basically will just sign a promissory note to the LLC. The LLC then will basically have a date on it of '16 [2016]. And then what you're going to do is you're going to put the money in to pay that promissory note off like as soon as possible after we get this set up and then we'll create everything for '16—the deduction, the 8283 [IRS form], so on and so forth. That's the way we do that, yeah.

8

28. On or about August 18, 2017, an ACA employee sent an email to Individual A with a copy to Defendant, Fischel, and Client 1's financial planner, stating that "[Client 1] will do a 2016 LLC."

29. On or about August 22, 2017, Individual A sent an email to Defendant and Fischel, which attached unsigned Transaction documents for a Shelf LLC for Client 1 to use, including an LLC agreement, an issuance document and an assignment document. Individual A requested "copies of the signatures pages and a copy of the signed Note," after which Individual A would "prepare the 8283." All of the Transaction documents attached to the email had been backdated to December 2016 to make it appear that the Transaction occurred in 2016. Fischel sent hard copies of the backdated Transaction documents to Client 1 by mail.

30. On or about August 29, 2017, an ACA employee sent an email to Individual A, with a copy to Defendant, Fischel, and Client 1's financial planner, which attached executed copies of the backdated Transaction documents signed by Client 1. The promissory note was backdated to December 31, 2016, and stated that Client 1 purportedly promised to pay the Shelf LLC $500,000 on December 31, 2016.

31. On or about September 5, 2017, Individual A provided Fischel and another ACA employee with a signed Form 8283 and instructed them to "have [Client 1] attach to his 1040." The Form 8283 falsely stated that Client 1 made a charitable contribution of LLC units to CBB on December 31, 2016, valued at $400,500. Individual A signed the Form 8283 as the appraiser. Defendant signed the Form 8283 on behalf of CBB. By signing the Form 8283, Defendant falsely represented that CBB received the donation of LLC units on December 31, 2016.

32. In or around September 2017, Client 1 provided the false Form 8283 to his accountant.

33. On or about October 16, 2017, by providing the false Form 8283 and other backdated Transaction documents, Defendant, Individual A, and Fischel caused Client 1's accountant to prepare a false 2016 Form 1040X ("Amended U.S. Individual Income Tax Return") for Client 1 and his wife, claiming a $400,500 charitable contribution tax deduction. Defendant knew that the tax return was false as to a material matter in that the charitable contribution did not occur in 2016.

*Client 2*

34. On or about May 11, 2017, Defendant promoted the Transaction to Client 2 in a telephone call and explained:

> The purpose of the LLC is to protect your money and make your assets grow. . . . No one can touch this money except you. We will also donate units from the LLC to a Donor advised fund, it is a paper transaction, you are not giving any money to the charity just the LLC units. The money is also under your control.
>
> . . .
>
> When you put money in you get a tax deduction, the money grows tax deferred and when you take it out there is no capital gains tax. Your LLC will become your own bank. You can borrow from your LLC and not pay any taxes on it.

35. On or about June 8, 2017, Fischel promoted the Transaction to Client 2 in a telephone call, explaining that he could assist Client 2 in claiming a charitable contribution tax deduction for tax year 2016 by utilizing a Shelf LLC:

> The way that the contributions works [sic] is we set up LLCs in 2016, you would use one of those LLCs. And, excuse me, and the way that it would be funded would be through a promissory note that's dated in 2016. And that would be for whatever contribution, let's say $250,000, and that would be your contribution for 2016. You'd get a tax deduction based off on that, the deduction would be approximately $200,000 for 2016, and when you file your 2016 tax return, you would include a Form 8283 that would give you that deduction, and you would probably get a refund of, maybe $80,000 or so from the federal government.

10

> . . .
>
> So you're basically – again you're putting money from one pocket to another pocket.

36. On or about June 8, 2017, Fischel sent an email to Individual A asking if Individual A had "any LLCs established in 2016." After Individual A confirmed that he did, Fischel responded to Individual A, with a copy to Defendant, that Client 2 "wants to do this for 2016" and that ACA "just signed him up a minute ago."

37. On or about June 19, 2017, Fischel sent an email to Individual A, with a copy to Defendant, stating that Fischel was attaching a "signed engagement agreement and information sheet for a client, [Client 2]."

38. On or about June 19, 2017, Individual A emailed Defendant, Fischel, and another ACA employee unsigned Transaction documents for a Shelf LLC for Client 2 to use, including an LLC agreement, an issuance document, and an assignment document. All of the Transaction documents attached to the email had been backdated to December 2016 to make it appear that the Transaction occurred in 2016.

39. On or about July 18, 2017, Fischel sent an email to Individual A, with a copy to Defendant, that attached executed copies of the backdated Transaction documents signed by Client 2, including an LLC agreement, issuance document, assignment document, and promissory note. The signed documents attached to the email were all backdated to December 2016 to make it appear that the Transaction occurred in 2016.

40. On or about August 2, 2017, Fischel sent an email to Client 2's accountant, with a copy to Defendant and Client 2, stating, "The value of the allowed deduction is $200,250 and was made on 12/30/2016. Please enter this charitable deduction into his year 2016 Form 1040 and attach a copy of this form to his return when it is filed." Attached to the email was a Form

11

8283 that falsely stated that Client 2 made a charitable contribution of LLC units to CBB on December 31, 2016, valued at $200,250.

41. On or about August 11, 2017, Fischel sent an email to Client 2's accountant that contained a slightly different version of the Form 8283 with the same false information contained in the Form 8283 sent on or about August 2, 2017. Individual A signed the Form 8283 as the appraiser. Defendant signed the Form 8283 on behalf of CBB. By signing the Form 8283, Defendant falsely represented that CBB received the donation of LLC units on December 31, 2016.

42. On or about August 23, 2017, by providing the false Form 8283 and other backdated Transaction documents, Defendant, Individual A, and Fischel caused Client 2's accountant to prepare and file a false 2016 Form 1040 ("U.S. Individual Income Tax Return"), claiming a $200,250 charitable contribution tax deduction. Defendant knew that the tax return was false as to a material matter in that the charitable contribution did not occur in 2016.

*Client 3*

43. In or around July 2017, Defendant promoted the Transaction to Client 3 and her husband as a method to reduce their 2016 federal income taxes.

44. On or about August 30, 2017, Fischel sent an email to Client 3 and her husband, with a copy to Defendant, advising that they could implement the Transaction for the 2016 tax year, by stating: "We estimate that your tax bill on this amount may be approximately $530,000+. We are able to implement a plan for you that can provide you with an approximate $640,000 tax deduction, which could put many tax dollars back in your pocket, rather than giving them up forever."

45. On or about September 12, 2017, Fischel sent an email to Client 3, with a copy to Defendant, Client 3's husband, and others, that attached engagement agreements with ACA and Individual A.

46. On or about September 13, 2017, Fischel sent an email to Individual A advising that Client 3 and her husband intended to execute the Transaction for tax year 2016: "[The husband] would like to contribute $800,000 to a new LLC for 2016. He will sign a promissory note. I assume you have an old LLC that can be used."

47. On or about September 15, 2017, Defendant and Fischel had a telephone call with Client 3 in which Fischel described the mechanics of the Transaction and the various tax benefits, as follows:

> [Y]ou have control over this LLC, which means that you can invest money however you'd like with – within this LLC. You can – you can also take money from this LLC, if you'd like. It's your LLC, you control it. It's kind of like a bank. But anytime you put money into your LLC or an account titled to your LLC, you get a tax deduction and we'll help you – we'll help provide that tax form to you so that you can claim that tax deduction on your personal tax returns.

48. On or about September 18, 2017, Individual A sent an email to Fischel, Defendant, and another ACA employee that attached an LLC agreement, an issuance document, an assignment document, and other documents that Individual A requested Client 3 to sign and attached an appraisal report for the gift. All attachments were backdated to make it appear as if the Transaction occurred in 2016

49. On or about October 5, 2017, Fischel sent an email to Client 3's accountant, with a copy to Defendant and Client 3, and attached a Form 8283 that falsely stated that Client 3 made a charitable contribution of LLC units to CBB on December 31, 2016, valued at $640,000 and a letter from CBB that falsely stated that Client 3 made the donation in 2016. Individual A signed

the Form 8283 as the appraiser and Defendant signed the Form 8283 on behalf of CBB. By signing the Form 8283, Defendant falsely represented that CBB received the donation of LLC units on December 31, 2016.

50. In response to questions about the Transaction from Client 3's accountant, on or about October 5, 2017, after consulting with Individual A, Fischel sent an email to Client 3's accountant that attached an executed promissory note that falsely represented that Client 3 and her husband entered into an agreement to pay their Entity $800,000 on December 31, 2016. The false date on the promissory note was designed to make it appear to Client 3's accountant that the Transaction occurred in 2016, when the promissory note had actually been signed on or about October 5, 2017.

51. On or about October 16, 2017, by providing the false Form 8283, false promissory note, and other backdated Transaction documents, Defendant, Individual A, and Fischel caused Client 3's accountant to prepare and file a false 2016 Form 1040 ("U.S. Individual Income Tax Return"), claiming a $640,800 charitable contribution tax deduction. Defendant knew that the tax return was false as to a material matter in that the charitable contribution did not occur in 2016.

*Client 4*

52. In or around September 2018, Defendant, Individual A, and Fischel caused Client 4 to submit false documents to the United States in response to a subpoena for documents that the United States had issued in the Injunction Suit (the "Client 4 Subpoena"). At the direction of Individual A and Defendant, Fischel provided Client 4 with unsigned copies of issuance and assignment documents that were backdated to December 2016 and 2017 for Client 4 to sign to substantiate deductions that Client 4 claimed on his personal income tax returns for tax years 2016 and 2017. Client 4 had claimed charitable contribution tax deductions resulting from the

Transaction for tax years 2015, 2016, and 2017. In 2016 and 2017, Client 4 did not execute issuance or assignment documents for the Transactions. Without the issuance and assignment documents, there was no charitable contribution to the charity.

53. In or around September 2018, following Fischel's instructions, Client 4 signed the backdated issuance and assignment documents and provided them to the United States in response to the Client 4 Subpoena.

*Client 5*

54. In 2016, Client 5 and his wife used approximately $92,439 from their Entity to pay for personal expenses, including purchasing personal vehicles, without executing any promissory notes with their Entity. Client 5 and his wife had claimed charitable contribution tax deductions resulting from the Transaction for tax years 2012 through 2015.

55. On or about January 4, 2017, Fischel sent an email to Client 5 and his wife, with a copy to Defendant and Individual A, stating, "To do this, you enter into a promissory note for each loan you take and write the check to yourself. If your LLC were to be audited, your practice of writing checks to pay for personal items not related to the LLC from the LLC's account may not pass muster, and your previous deductions may be denied."

56. On or about January 5, 2017, at the direction and with the approval of Individual A and Defendant, Fischel sent an email to Client 5 and his wife, with a copy to Defendant and Individual A, relaying Individual A's offer for Client 5 and his wife to purchase back their interest in the Entity from Charity 1 for $10,000, stating *"**Obviously, this would be a windfall for you both.** You will have been granted $764,350 of tax deductions, tax free growth, etc. and will be able to regain complete ownership over your money for approximately 1.3% of the total amount currently in the LLC."*

57. On or about February 16, 2017, Client 5 sent an email to Fischel, with a copy to Individual A and Defendant, that attached a signed Settlement Agreement and Mutual Release that had been prepared by Individual A in which Client 5 and his wife purchased back their interest in their Entity for $10,000. The settlement agreement was eventually signed by Client 5, Client 5's wife, Individual A, Defendant, and Individual A as the representative of Charity 1.

58. On or about March 2, 2017, Client 5 paid $10,000 to Charity 1.

59. In or around June 2018, Defendant, Individual A, and Fischel assisted Client 5 in submitting false documents to the United States in response to a subpoena for documents that the United States had issued in the Injunction Suit (the "Client 5 Subpoena"). Fischel, at the direction of Individual A and Defendant, provided Client 5 with unsigned copies of issuance and assignment documents backdated to dates in 2013, 2014, and 2015 for Client 5 to sign to substantiate deductions that Client 5 claimed on his personal income tax returns for tax years 2013 through 2015.

60. In or around June 2018, Client 5 provided documents in response to the Client 5 Subpoena, including backdated promissory notes, backdated issuance and assignment documents, and a backdated attorney engagement agreement.

All in violation of Title 18, United States Code, Section 371.

COUNT 2
(Aiding and Abetting the Filing of a False Tax Return, 26 U.S.C. § 7206(2))

The United States Attorney further charges:

61. The allegations contained in paragraphs 1 through 7 of this Information are incorporated by reference as if stated fully herein.

62. On or about October 18, 2017, in the Northern District of Ohio and elsewhere, Defendant, RAO GARUDA, willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the Internal Revenue Service of a joint Amended U.S. Individual Income Tax Return, Form 1040X for Client 1 and Client 1's wife for calendar year 2016, which was false and fraudulent as to a material matter. That amended tax return reported a charitable contribution tax deduction of $400,500 on Schedule A, line 17 whereas, as Defendant knew, Client 1 and Client 1's wife were not entitled to claim the charitable contribution tax deduction.

All in violation of Title 26, United States Code, Section 7206(2).

REBECCA C. LUTZKO
United States Attorney

By: *[signature]*
MICHAEL L. COLLYER
Chief, White Collar Crime Unit

By: *[signature]*
MICHAEL C. BOTELER
Assistant Chief
CASEY S. SMITH
Trial Attorney
U.S. Department of Justice, Tax Division,
Southern Criminal Enforcement Section